NORTHWESTERN STATES PORTLAND CEMENT CO., PETITIONER, *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 5763, 10456.   Promulgated July 29, 1927.

1. The purchase price paid by petitioner's incorporators for
limestone lands, shortly before petitioner was organized, and the
land exchanged for stock, establishes the value of such lands for
invested capital purposes.

2. The value of such lands exchanged for stock, together with
sales of common stock, provides a basis for allocating the selling
price of blocks of stock, the sales purporting to be of preferred
stock at par with common stock issued as bonus to purchasers
between the respective classes of stock, thereby determining the
value of the common stock.

3. The March 1, 1913, value of limestone and clay lands deter-
mined and the value of such lands as of January 1, 1914, deter-
mined by reducing the March 1, 1913, value proportionate to the
extraction in the interim, and such value allowed as invested
capital for 1917 (under section 207 of the Act of 1917) to the
extent that such value does not exceed the par value of the stock
specifically issued therefor.

4. An accurate estimate of the deposit content accepted as a
basis for depletion, though such estimate was made subsequent to
the basic date.

5. The book reserve for depreciation in prior years, representing
the judgment of an experienced officer with intimate knowledge of
construction, operation and care, may not be increased for invested
capital purposes by computing depreciation for such years on a
straight line basis.

6. Current earnings available for dividends may not be reduced
by a tentative tax.

7. In the absence of evidence, claim for special assessment
under sections 327 and 328 denied.

*John Thomas Taylor, Esq.,* and *Briggs G. Simpich, Esq.,* for the
petitioner.

*A. George Bouchard, Esq.,* and *Granville S. Borden, Esq.,* for the
respondent.

These proceedings result from the determination by respondent
of deficiencies in income and profits tax for the calendar years
1917 to 1920, inclusive, amounting to $475,828.82. The proceed-
ings for all years were consolidated for hearing and decision.
Petitioner avers errors with reference to the following issues: (1)
The failure to include in invested capital the actual cash value
of land and personal services paid in for stock; (2) the fair market
value of the deposits of limestone and clay owned by the petitioner
on March 1, 1913, have been incorrectly determined, as well as the
tons thereof in reserve on that date for depletion purposes; (3)

invested capital has been erroneously reduced for all years by reason of an adjustment with respect to depreciation sustained prior to January 1, 1917; (4) the value has been erroneously determined as of January 1, 1914, of tangible property, paid in for capital stock, allowable in invested capital in 1917; (5) the deduction of a tentative tax in determining current earnings available for dividends in the years 1917 and 1920, was in error; (6) the excess-profits taxes for the years 1918, 1919, and 1920 should have been computed pursuant to the provisions of sections 327 and 328 of the Revenue Act of 1918.

FINDINGS OF FACT.

Petitioner is a West Virginia corporation with its principal office and place of business at Mason City, Iowa. It was organized to acquire and develop properties containing deposits suitable for the manufacture and sale of Portland cement. A partnership known as the Cowham Engineering & Construction Co. caused the petitioner to be incorporated for the purpose designated. Since 1898, W. H. L. McCourtie and W. F. Cowham had been associated under the name of the Cowham Engineering & Construction Co. in the development of properties containing cement-making materials. As early as 1900, they had organized a cement-manufacturing company, known as the Peninsula Portland Cement Co., to develop certain cement deposits in the State of Michigan. The cement business, at the time of the development of the Michigan properties by the Cowham Engineering & Construction Co., was in its early stage of usefulness and expansion. Cowham and McCourtie decided to organize a partnership to erect plants and further develop the possibilities of the cement-manufacturing business. A large technical staff was employed, consisting of staff prospectors, mineralogists, chemists and engineers capable of rendering services necessary to develop a cement business from preliminary prospecting for suitable deposits to promotion of an operating organization and construction of needed plant facilities. Prior to the organization of petitioner, the partnership had constructed five cement mills and developed what was then known as the " Cowham System," the outcome of their long experience in designing, constructing, and actually operating cement mills.

Being of the opinion that the northern part of Iowa would be a desirable location for a Portland cement mill, they prospected the States of Iowa and Minnesota, finally selecting the vicinity of Mason City, Iowa, as the most promising in the combination of available raw materials and proximity to a future market. A certain tract of 160 acres was considered the most desirable and adjacent tracts were also selected to a total of 286 acres. These properties were acquired by Cowham and McCourtie through the purchase of options held

by Cruickshank & Ritter (a firm which had previously built a cement mill at Neodesha, Kans.) and of the fee from various individuals. Title was actually acquired in the early part of the spring of 1906, and very shortly thereafter, on April 6, 1906, the petitioner was incorporated in West Virginia with an authorized capital stock of 35,000 shares, par value $100; 20,000 shares preferred and 15,000 shares common. At incorporation, 300 shares had been subscribed for.

On the following day, the apportionment was changed to 17,500 shares of preferred and 17,500 shares of common, the par value of $100 each and the total shares, 35,000, remaining unchanged. The preferred stock was entitled to a fixed dividend rate of 7 per cent per annum, beginning July 1, 1907, cumulative, and payable annually if declared, with preference extending to assets as well as earnings and with voting power equal to that of the common stock, share for share. The corporation was organized with a very broad charter, but its interests and activities were centered in the manufacture and sale of Portland cement, the principal raw materials being quarried from its own lands. The principal office was at first located at Jackson, Mich., and was later changed to its present location at Mason City, Iowa. The first meeting of the stockholders was held at Jackson, Mich., on April 7, 1906. W. F. Cowham presented a proposition to subscribe for 1,850 shares of preferred stock and 5,300 shares of common stock on conditions embodied in a contract submitted to petitioner. The Cowham Engineering & Construction Co. presented a proposition to subscribe for 4,375 shares of common stock and pay therefor in services in construction of a plant as per written contract presented at the meeting. The board of directors was authorized and directed to execute both contracts. The sale at par value (with adjustment to allow interest to July 1, 1907) of the preferred stock with a bonus, without additional charge, of one-half share of common stock for each share of preferred stock, was authorized. The issue was authorized of common stock to each of the incorporators, of one-half share per each share of preferred stock subscribed for in connection with the organization. The first meeting of the board of directors was held at Jackson, Mich., on April 7, 1906. The vice president and treasurer were ordered to execute contracts as follows:

Articles of Agreement, made and entered into this 6th day of April, 1906, by and between The Northwestern Portland Cement Company, a corporation organized under the laws of West Virginia, of the first part, and William F. Cowham and W. Herbert L. McCourtie, of Jackson, Michigan, of the second part:

Witnesseth: that whereas, the said parties of the second part have subscribed for five thousand three hundred (5,300) shares of the Common Stock of said Company, and one thousand eight hundred and fifty (1,850) shares of its Preferred Stock, and,

Whereas, said Cowham has achieved a conspicuous success in the organization, management and control of Portland Cement Mills, and said McCourtie has been associated with him in the control of the sale of stock in corporations organized therefor, and said Company is desirous of availing itself of their services in connection with its operation, and the sale of its stock, and said Cowham and McCourtie are now the equitable owners of certain lands being two hundred and eighty-six (286) acres, or thereabouts, near Mason City, Iowa, which are very valuable because of rich mineral deposits suitable for the production of Portland Cement, said land being also suitable for a mill site in connection therewith, all of which said Company is desirous of securing.

Therefore, these presents witness, that the said W. F. Cowham and W. H. L. McCourtie, hereby agree to convey, or cause to be conveyed, to said Company, by good and sufficient deed of conveyance, all and singular the above lands and mineral rights, together with the tenements and appurtenances thereunto pertaining, and also agree to render the said Company in the organization, management and control of its said business, their experience, skill, time and service, as General Manager and Manager of Stock Sales, respectively, on such terms as shall be agreed upon with the Directors of said Company, and use their best endeavors to contribute thereby to its prosperity to the extent that is consistent with and permitted by like obligations to other plants of similar character, with which said Cowham and McCourtie are now, or may be hereafter, connected.

In consideration of the premises, said party of the first part, by its officers duly authorized hereto by unanimous vote of its stockholders in regular meeting, hereby agrees to transfer to said W. F. Cowham and W. H. L. McCourtie the said one thousand eight hundred and fifty (1,850) shares of its Preferred stock and five thousand three hundred (5,300) shares of its Common Stock fully paid and non-assessable, upon delivery of proper title to said lands, free from all encumbrance.

Witness the hands of the parties, the said Company by its Vice-President and Treasurer, duly authorized the day and year aforesaid.

Articles of Agreement made and entered into this sixth day of April, 1906, by and between the Northwestern States Portland Cement Company, a corporation organized under the laws of West Virginia of the first part, and the Cowham Engineering and Construction Company of Jackson, Michigan, of the second part.

Witness, Whereas: said party of the second part has control through its organization of engineers of great proven skill in the construction of Portland Cement Mills, who have demonstrated the great success of the system of construction and processes of manufacture followed by them, in what has become known as the Cowham System of Portland Cement Mills, and said party of the first part is desirous of availing itself of said skill and experience of the engineering force so controlled by the said party of the second part in the construction and installing of its proposed plant at Mason City, Iowa.

Now, Therefore, These Presents Witness: That the said party of the second part agrees to furnish through its engineering force complete plans and specifications and a competent engineer to supervise and direct in the execution thereof, and in the erection of all necessary buildings and machinery therefor, and for the full installation of the system of manufacture adopted.

In consideration thereof, said party of the first part agrees to issue to said party of the second part certificates for four thousand three hundred and seventy-five shares of its common capital stock fully paid and non-assessable, and further agrees to pay to said party of the second part a sum equal to ten percent of the entire cost of construction and equipment and to pay all traveling and other expenses that are necessarily incurred in such service.

In witness whereof the said parties have hereunto set their hands and seals (the said corporation acting herein by its Vice-President and Treasurer duly authorized by the stockholders hereof) the day and year aforesaid.

Deeds to the lands described in the contract set forth above were presented by the promoters and accepted at a special meeting of the board of directors held at Chicago, Ill., on June 2, 1906.

All of the preferred shares with a bonus of one-half share of common stock were sold for cash at a price equal to the $100 par value of the preferred stock. Certain shares of stock due Cowham and McCourtie as part consideration for 286 acres of land, being 1,850 shares of preferred and 925 shares of common, were, at their request, sold for $185,000 cash by petitioner and the proceeds credited to their account by the petitioner. There were also issued to them, 4,375 shares of common stock for the land. The 286 acres of land transferred by Cowham and McCourtie to the petitioner had cost the former $247,000 in cash, and they had also agreed to cause to be issued to the prior owners of the land 100 shares of preferred stock and 1,250 shares of common stock of the corporation to be organized. Cowham and McCourtie received from petitioner, 1,850 shares of preferred stock and 5,300 shares of common stock in consideration of the transfer to the petitioner of the 286 acres of land in question. A share of preferred stock had a value of $88.66 and a share of common stock had a value of $22.68 at the date when 286 acres of land were turned in to the petitioner for its capital stock. The cash value of the 286 acres of land paid in for capital stock was $284,225, and the par value of the capital stock issued specifically therefor was $715,000.

The plant was erected under the direction of the Cowham Engineering & Construction Co. and commenced production in 1908, with a capacity of 4,000 barrels per day.

The services of the Cowham Engineering & Construction Co., for which 4,375 shares of common stock were issued, had a value of $99,225.

Additional lands were acquired subsequent to 1906 at various dates by purchase for cash, and they included deposits of limestone and clay.

In 1912, a dealer in real estate in Mason City, Iowa, was commissioned by petitioner to purchase limestone lands lying immediately south of petitioner's quarry, at a price not to exceed $5,000 per acre.

Prior to January 1, 1914, estimates of the qualities and quantities of limestone and of clay deposits underlying the lands of the petitioner were based mainly on surface indications, outcroppings, exposures of strata in ravines, and a few scattered holes or test pits.

Petitioner has never operated more than one quarry and one clay pit.

On March 1, 1913, lands belonging to the petitioner of an area of 194 acres, were underlaid with available limestone deposits suitable for use in the manufacture of Portland cement, and these lands had a value of $5,000 per acre.

The fair market value of the available limestone deposits of the petitioner, on March 1, 1913, was $970,000.

On March 1, 1913, lands belonging to the petitioner, of an area of 83.3 acres, were underlaid with beds of available clay deposits suitable for use in the manufacture of Portland cement and these lands had a value of $5,000 per acre.

The fair market value of the available clay beds of the petitioner, on March 1, 1913, was $416,500.

The 286 acres of land acquired for capital stock in 1906, together with the deposits of limestone and clay underlying them, on January 1, 1917, had an actual cash value as of January 1, 1914, in excess of the par value, $715,000 of the capital stock specifically issued therefor.

A systematic survey of the limestone-bearing and clay-bearing lands of the petitioner by means of core borings and chemical analyses, was begun in 1922, with the result that at the end of 1923 the amount, character, and availability of the limestone deposits then existing were satisfactorily ascertained and similar information relative to the clay was ascertained in 1924. From this survey and from statistics of production prior thereto, the following reserves are determined:

|  | Depletion, tons | Reserve, tons |
|---|---|---|
| Available limestone: | | |
| At beginning of operations | | 17,151,212 |
| Depletion— | | |
| 1908 | 174,286 | |
| 1909 | 202,651 | |
| 1910 | 246,153 | |
| 1911 | 294,163 | |
| 1912 | 303,936 | |
| To Feb. 28, 1913 | 27,146 | 1,248,335 |
| Reserve Mar. 1, 1913 | | 15,902,877 |
| Depletion to Dec. 31, 1913 | 286,565 | |
| Depletion— | | |
| 1914 | 388,403 | |
| 1915 | 463,167 | |
| 1916 | 433,548 | |
| 1917 | 452,083 | |
| Acquired, 1917 | | 2,065,072 |
| | | 17,967,949 |
| Depletion – | | |
| 1918 | 348,121 | |
| 1919 | 327,269 | |
| 1920 | 422,999 | |
| 1921 | 446,788 | |
| 1922 | 409,036 | |
| 1923 | 491,109 | 4,469,088 |
| Reserve Dec. 31, 1923 | | 13,498,861 |

| | Depletion, tons | Reserve, tons |
|---|---|---|
| Available clay: | | |
| At beginning of operations | | 5,298,013 |
| Depletion— | | |
| 1908 | 48,336 | |
| 1909 | 69,024 | |
| 1910 | 78,584 | |
| 1911 | 89,038 | |
| 1912 | 91,606 | |
| To Feb. 28, 1913 | 4,133 | 380,721 |
| Reserve Mar. 1, 1913 | | 4,917,292 |
| Depletion to Dec. 31, 1913 | 92,316 | |
| Depletion— | | |
| 1914 | 136,450 | |
| 1915 | 144,089 | |
| 1916 | 135,386 | |
| 1917 | 128,008 | |
| 1918 | 104,223 | |
| 1919 | 106,925 | |
| 1920 | 119,508 | |
| 1921 | 108,787 | |
| 1922 | 114,761 | |
| 1923 | 136,000 | 1,327,413 |
| Reserve Dec. 31, 1923 | | 3,589,879 |

The respondent has reestimated the depreciation sustained prior to January 1, 1917, arriving at an amount $985,625.91 in lieu of the amount $702,039.88 shown on the books on December 31, 1916, and has reduced invested capital accordingly. The plant was well constructed, frequently improved, constantly inspected, and was at all times kept up to the highest state of efficiency.

The reserve shown on the books was the aggregate of annual depreciation allowances computed on a rate per barrel of cement produced, based on the judgment of the officers of the petitioner that it was adequate. The respondent recomputed the depreciation sustained to January 1, 1917, on the straight line method, using an annual composite rate of 5 per cent.

Respondent, in computing invested capital for the years 1917 and 1920, reduced current earnings available for the payment of dividends by tentative taxes estimated for the current years.

OPINION.

MILLIKEN: The first issue relates to the action of respondent in holding that nothing of value which may be included in invested capital was paid in for petitioner's common stock. Petitioner avers that the common stock was issued in part payment for land and plant assets, both being of substantial value. The problem is to determine the actual cash value of that which was paid in for the stock of petitioner. We must determine not the value of the stock in and of itself for invested capital purposes, but the actual cash value of the land and services paid for the same. There is not sufficient direct evidence upon which we may depend, in fixing a value of the property and personal services for which a large block of common

stock was issued. However, we are of the opinion, in this case, that we should take into account the various considerations that entered into the various transactions, by reason of which the stock was issued or sold, and from the same we will be enabled to determine the value of the preferred and common stock of petitioner, with a resultant value of the land and personal services paid in for the same.

We find cash of $30,000 was paid for 300 shares of preferred stock subscribed for at the date of incorporation, and petitioner caused to be issued to the subscribers 150 shares of common stock as a bonus. There were sold for cash in the open market, 15,350 shares of preferred stock and 7,675 shares of common stock, for $1,535,000. To Cowham and McCourtie were issued 1,850 shares of preferred and 5,300 shares of common in payment for 286 acres of land, and the petitioner, as their agent, sold in the open market for their account 1,850 shares of preferred and 925 shares of common, crediting the proceeds of $185,000 to their account. In addition to a cash payment, the Cowham Engineering & Construction Co. received 4,375 shares of common stock in payment for their services incident to the construction of the plant.

One of the most important assets which the petitioner acquired at date of incorporation was the valuable 286 acres of limestone lands, which McCourtie and Cowham had acquired. Only a short time elapsed after the date McCourtie and Cowham acquired the lands before they were transferred to petitioner. What was the cost of the lands to them? They purchased the lands on their own account, paying therefor, in cash, $247,000, and agreed to cause to be issued to the persons from whom they acquired the lands, 100 shares of preferred stock and 1,250 shares of common stock of a corporation to be organized. The persons from whom they purchased the lands were in a position to be informed as to their true value and certainly McCourtie and Cowham knew of their value when transferring the lands to the petitioner.

That which was paid in for one share of preferred stock and one-half share of common stock, is clearly evidenced by the sales in the open market and the sales of the 1,850 shares of preferred stock and 925 shares of common stock of Cowham and McCourtie, on the basis of $100 for the combination. If we had only the issuance of the 17,500 shares of preferred and 8,750 shares of common stock sold for cash at rate of one share preferred and one-half share of common for $100, our problem would be simple of solution, but we have an additional block of 8,750 shares of common stock, which were issued in part payment for land and services of substantial value.

Cowham and McCourtie paid for the 286 acres of mineral lands, $247,000 in cash and agreed to pay McNider $10,000, or a cost of

$257,000, and they received from petitioner, from the sale of 1,850 shares of preferred stock and 925 shares of common stock, $185,000. After the transaction incident to the sale was concluded, whereby all parties to the transaction had received the stock to which they were entitled, we find Cowham and McCourtie left with $185,000 in cash and 3,175 shares of common stock in payment for the transfer of the lands to the petitioner. The difference between $257,000 (cost to Cowham and McCourtie) and the cash received, $185,000, leaves an amount of $72,000, and we think this correctly reflects that which was paid in for the 3,175 shares of common stock held by them, and results in a value of $22.68 for each share of common stock. That which was paid for so large a block of common stock is also representative of that which was paid for the entire issue of common stock. We are of the opinion that the services of Cowham Engineering & Construction Co., being a part of the cost of the plant and for which 4,375 shares of common stock were issued, were of a value equal to $22.68 for each share of common stock, or a value for the services paid in of $99,225. It has been shown that large blocks of preferred stock were sold for $100 per share, with a bonus of one-half share of common stock. By subtracting from the sale price of $100, the value of one-half share of common stock, or $11.34, we find a value for the preferred stock of $88.66 per share. Application of the value per share of the common stock to the total issue, 17,500 shares, results in a value of $396,900, and application of the value per share of the preferred stock to the total issue of 17,500 shares, results in a value of $1,551,500, or a total value for both issues of stock of $1,948,450. Respondent has allowed in invested capital only the par value of the preferred stock, or $1,750,000, thus understating invested capital for all the years by the difference here allowed, or $198,450.

The second issue relates to the value as of March 1, 1913, of the deposits of limestone and clay owned by the petitioner. The issue is common to all the years, due to the deductions allowable for depletion. The determination of quantity, as well as value, is involved.

We are satisfied that the survey of the petitioner's properties, begun in 1922 and completed in 1924, was careful and thorough—very much more so than the original prospecting—and that the results shown satisfactorily establish the content in tons of the deposits of limestone and of clay. We have previously held that an accurate estimate of available reserves was acceptable for computations of depletion, notwithstanding that it was made several years subsequent to the basic date. *Kehota Mining Co.*, 3 B. T. A. 885, and the principle is of evident application in the instant case, where the de-

posits are fixed in character. Accordingly, the survey is accepted and the reserves are determined, as indicated in the findings of fact.

As to the values of the limestone and clay, on March 1, 1913, reliance by the petitioner rests on opinion evidence. The opinions are those of the promoter of the enterprise, and of an experienced dealer in real estate, who had resided all his life in the vicinity in which the property is located. Their opinions coincided in values of $5,000 per acre for both limestone and clay lands, as of March 1, 1913. The real estate dealer testified that in 1912, representing the petitioner, he had offered as high as $5,000 an acre for land immediately south of petitioner's quarry, but the offer was refused. He further testified that cement and clay lands around Mason City, in 1912 and 1913, were under great demand, amounting to a "flurry." The only evidence before us as to the fair market value of the property at March 1, 1913, leads to the conclusion that $5,000 per acre is supported for the lands of the petitioner containing limestone and clay, not heavily overburdened, but that such value is of application limited to lands of large available deposits and was the result of peculiar local conditions.

The petitioner lays claim to an area of 274 acres of limestone land to which the value of $5,000 attaches, but we are not convinced that two areas, referred to as divisions 3 and 4, stated to contain 40 acres each, or a total of 80 acres, are properly to be included at such a value. A railroad right of way of undisclosed area through the lands, raises a doubt that the area actually owned by the petitioner was a full 80 acres in extent and a majority of the acreage, due to the heavy overburden and the low content of available limestone, does not classify reasonably as land worth $5,000 an acre. Claim is made to an area of 200 acres of clay lands, but it is in evidence that the clay was found to extend to only a small amount under one of the arbitrary divisions of 40 acres, and we are not satisfied that the entire area of the remaining 160 acres was underlaid with clay so as to have a total value of $800,000.

After careful consideration of all the evidence, we are satisfied that on March 1, 1913, the limestone-bearing lands of the petitioner, of the value of $5,000 an acre, comprised an area of at least 194 acres and its clay lands of the value of $5,000 an acre comprised an area of at least 83.3 acres and we are of the opinion that these lands had a fair market value on that date of $970,000 for the limestone lands and $416,500 for the clay lands.

Relative to the third issue, it is in evidence that the plant was constantly maintained in a condition of the highest efficiency and repair and in the judgment of an experienced official of the peti-

tioner, based on an intimate knowledge of operating conditions, plant construction and care, the reserve of $702,039.88 charged off of the petitioner's books at December 31, 1916, was ample, and truly reflected the depreciation actually sustained to that date. There is no evidence whatever, to show that the depreciation sustained was greater than the amount charged off on the books. The respondent has set up a computation of estimated depreciation based on cost, and applying a fixed percentage rate per annum, thereby endeavoring to substitute a "straight-line" method for the years gone by, in lieu of the depreciation which was charged off on the books. We have repeatedly held that depreciation is a question of fact and that a readjustment of the depreciation reserve, resulting in a reduction of invested capital, may not be based merely on a formula or method of computation. *Cleveland Home Brewing Co.*, 1 B. T. A. 87; *Russell Milling Co.*, 1 B. T. A. 194; *Rub-No-More Co.*, 1 B. T. A. 228; *Otis Steel Co.*, 6 B. T. A. 358. See also *Haugh & Keenan Storage & Transfer Co.* v. *Heiner*, 20 Fed. (2d) 921.

In view of the evidence, we are of the opinion that the reduction of invested capital by the respondent, in the amount of $283,586.03, was unwarranted and should be restored to invested capital for each of the years 1917 to 1920, inclusive.

The fourth issue relates to the amount of invested capital allowable for the year 1917, under the provisions of section 207 of the Revenue Act of 1917.

It is in evidence that 286 acres of land were acquired in 1906 for 7,150 shares of capital stock and were still owned by the petitioner on January 1, 1917, having been depleted in the interim by the extraction of limestone deposits aggregating a definite tonnage. There is an entire absence of evidence that the lands declined in value between March 1, 1913, and January 1, 1914, save to an extent measurable by the tonnage of limestone extracted during that period. From the value determined above, as of March 1, 1913, based on the fair market value, $5,000 per acre for limestone lands and a commensurate value of all other lands, we are satisfied that the lands and reserves owned on January 1, 1917, had a value as of January 1, 1914, in excess of the par value of the capital stock specifically issued for them and find the amount allowable in invested capital for 1917, to be $715,000, the par value of the stock issued for the lands in question.

In the fifth issue, the action of the respondent in reducing current earnings available in 1917 and 1920, for dividends, through the accrual of a tentative tax, is reversed. *Appeal of L. S. Ayers & Co.*, 1 B. T. A. 1135.

The respondent is sustained in the sixth issue, involving special relief under sections 327 and 328 of the Revenue Act of 1918. We discern no abnormality of capital or income and there is, in the record, no evidence thereof, or of gross disparity of tax.

Reviewed by the Board.

*Judgment will be entered on 30 days' notice, under Rule 50.*